Filed 6/30/14  P. v. Yepez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERTO YEPEZ,<br><br>    Defendant and Appellant. | B247429<br><br>(Los Angeles County<br>Super. Ct. No. BA399823) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Craig Elliott Veals, Judge.  Affirmed.

Eileen M. Rice, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Roberto Yepez appeals from the judgment entered after a jury convicted him of two counts of being a felon in possession of a firearm and one count of exhibiting a firearm, along with allegations that the firearm-possession counts were committed for the benefit of his street gang. We reject his contentions that the trial court erred by allowing the prosecution to introduce rebuttal evidence concerning his access to the car used to commit one set of the crimes and that there was insufficient evidence to support one of the street gang allegations. We therefore affirm the judgment.

**FACTS AND PROCEDURAL HISTORY**

At around 7:00 p.m. on June 29, 2012, John M. was playing kickball on St. Elmo Drive with his daughter and several other children.[1] John was a former member of the Sureno 13 gang and that stretch of St. Elmo Drive was claimed by Sureno's rival, the 18th Street gang. John saw 18th Street gang member Jose Gomez, known as Darky, riding a bicycle alongside a slow-moving tan or gray Ford Explorer. John had had several run-ins with Gomez over the years.

As Gomez and the Explorer approached John, Gomez began shouting insults to the Sureno gang. John ignored the first three, but after Gomez hurled another insult, John responded in kind with insults to 18th Street. Gomez approached John and the mutual insults continued, followed by Gomez spitting on John, and John spitting back. Gomez walked toward the Explorer and then walked back toward John, who pulled out a small knife and held it at his side to protect his girlfriend and the nearby children.

John and his girlfriend both saw the driver of the Explorer reach under the front seat. The driver then headed toward John, almost hitting the children before stopping. The driver's side window was down and both John and his girlfriend saw that the driver was holding a semiautomatic handgun in his lap with the barrel pointed toward the driver's side door. The driver asked John why he was in his neighborhood. John replied that he had lived there since 1991. The driver said the area was "his hood" and told John

---

[1] We will refer to victim John M. by his first name.

to "get the fuck out of there." After John's girlfriend told the driver to respect the fact that children were present, he told her to "stay the fuck out of it" and drove off.

The police were called and, after viewing suspect photographs, John and his girlfriend identified Roberto Yepez as the driver of the Explorer. Several days later the police obtained a warrant to search the apartment where Yepez lived with his sister, Ana Rojas, as well as Rojas's gray Explorer. A loaded .357 caliber revolver and boxes of 10 mm and 45 caliber ammunition were found hidden behind a drawer in a hallway cabinet. Yepez slept on the living room sofa and a key ring that included a key to the Explorer was on the coffee table in front of the sofa. Detective Carlton Jones used that key to start the engine on the Explorer. A search of the vehicle turned up nothing incriminating.

The police recorded an interview with Yepez, where he denied any knowledge of the incident with John, and also claimed that he never drove his sister's Explorer. At the time of the police search, however, Yepez told officers that he had the keys because he had been repairing that car. He admitted that the revolver found at his sister's house belonged to him.

Yepez, who had several prior convictions, was charged with one count of exhibiting a firearm and one count of being a felon in possession of a firearm in connection with the incident involving John, and with another count of being a felon in possession of a firearm based on the revolver found at his sister's house. It was also alleged that the two firearm-possession counts were committed for the benefit of Yepez's gang.

A jury convicted Yepez of all three counts and found true the street-gang allegations. He contends we should reverse the judgment because: (1) the trial court erred by allowing rebuttal evidence from a police officer about his admission that he sometimes drove his sister's Explorer; and (2) there was insufficient evidence that he possessed the gun found at his apartment with the intent to benefit his gang.

3

**DISCUSSION**

1.  *No Error In Admitting Rebuttal Testimony*

Rojas testified for her brother that he did not have access to her Explorer, and was not allowed to drive it. She also testified that she had the only key to that car and the key was not on the key ring found on the coffee table. Finally, she claimed the Explorer was in need of repairs and had not been operable at the time of the incident involving John. On cross-examination by the prosecution she denied that Yepez ever drove the Explorer and denied telling the police that her brother sometimes or "barely" drove the car.

After the defense rested the prosecution called Los Angeles Police Officer John Shafia as a rebuttal witness. Shafia testified that he questioned Yepez and Rojas at their home on July 2, 2012. According to Shafia, Rojas told him that Yepez in fact drove the Explorer. When the prosecutor asked whether Yepez said anything about having ever used the Explorer, defense counsel objected that the prosecution was trying to introduce improper rebuttal evidence because evidence of Yepez's supposed statements belonged in the prosecution's case-in-chief. The trial court overruled that objection, and Shafia testified that Yepez said he drove the Explorer. Yepez contends the trial court erred.

Under Penal Code section 1093, subdivision (d), the trial court has broad discretion to determine whether rebuttal evidence is admissible. (*People v. Edwards* (2013) 57 Cal.4th 658, 733.) Rebuttal evidence is limited to evidence made necessary by the defendant's case because he has introduced new evidence or made assertions that were not implicit in his denial of guilt. (*People v. Young* (2005) 34 Cal.4th 1149, 1199 (*Young*).) Proper rebuttal evidence does not include evidence that is material to the prosecution's case which tends to establish that defendant committed the crime. (*Ibid.*) The purpose behind these restrictions is to: (1) ensure the orderly presentation of evidence so as not to confuse the jury; (2) prevent the prosecutor from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) avoid unfairly surprising the defendant with crucial evidence late in the trial. (*Ibid.*)

4

The court in *Young, supra,* 34 Cal.4th 1149, considered the admissibility of rebuttal evidence in a case where the defendant was charged with murder after gunning down his victim. A witness testified on direct examination that she saw the defendant exit the driver's side of a car with a gun in his hand, who then approached her and the victim and ordered them to their knees. On cross-examination, the witness was impeached with statements that she saw the passenger exit the vehicle while the driver remained behind. Two police officers also confirmed those statements during the defense case. The prosecution called a rebuttal witness who also witnessed the incident and said the shooter had come from the driver's side of the car.

On appeal, the defendant contended the trial court had erred by allowing the rebuttal testimony. The Supreme Court held that no error occurred even though the witness could have been presented during the prosecution's case-in-chief because the testimony corroborated the other witness's testimony that had been impeached during the defense case. The substance of the rebuttal witness's testimony had therefore "already been conveyed to the jury during the prosecution's case-in-chief. Testimony that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal." (*Young, supra,* 34 Cal.4th at p. 1199.)

We conclude that the *Young* court's rationale applies here. During its case-in-chief, the prosecution presented two eyewitnesses who saw Yepez driving the Explorer. Yepez's sister owned an Explorer of the same approximate color, Yepez lived with his sister, and there was direct evidence that the key to that vehicle was found directly in front of where he slept. Although the prosecution could have asked Officer Shafia about Yepez's statement during its case-in-chief, the evidence was not material for purposes of determining the admissibility of rebuttal evidence. As in *Young,* the substance of Shafia's testimony – that Yepez had access to the Explorer – had already been conveyed to the jury.

Although evidence of Yepez's admission that he sometimes drove the Explorer would have tended to support the prosecution's case, that did not make it improper rebuttal evidence. (*People v. Warner* (1969) 270 Cal.App.2d 900, 906.) Once Rojas took

5

the stand and denied that her brother had access to the Explorer, it was proper to rebut her testimony with evidence that not only did she tell the police something contrary, but that her brother admitted in her presence that he sometimes drove the car. (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1212.)

We alternatively conclude that even if the trial court erred, the error was not prejudicial. Prejudice in this context requires a showing that a result more favorable to Yepez was reasonably probable absent the error. (*People v. Bunyard, supra,* 45 Cal.3d at p. 1213.) As noted above, two eyewitnesses placed Yepez behind the wheel of the Explorer. His sister owned an Explorer of the same approximate color, keys to that car were found by his sleeping area, and his sister's testimony was properly rebutted with evidence that she told the police Yepez drove the Explorer. On this record, we conclude there was no prejudice.

2.    *There Was Sufficient Evidence to Support the Gang Allegation*

In order to prove the street gang allegations appended to the firearm possession counts, the prosecution had to show that Yepez possessed the weapons with the specific intent to promote, further, or assist criminal conduct by fellow gang members. (Pen. Code, § 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 62-63, 67.) Expert testimony regarding whether a crime was gang-related is admissible and may be given in response to hypothetical questions that track the prosecution's evidence, and may embrace the ultimate issues to be decided. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045-1046, 1049-1050 & fn. 5.)

Los Angeles Police Officer Ruben Rodriguez testified as an expert on street gangs. Rodriguez testified that gang members typically share or pass around firearms so the police cannot easily trace them. For gang members on probation or parole who are not allowed to keep guns, that practice allows them access to firearms. After being posed a hypothetical set of facts that tracked the prosecution's evidence, Rodriguez opined that the gun found inside the gang member's house after the earlier brandishing incident would have benefitted the gang by facilitating that exchange process. He opined that an

6

18th Street gang member who acted in a manner consistent with the evidence against Yepez would have possessed a firearm on both occasions for the benefit of his gang.

Yepez contends this evidence was insufficient to establish that he possessed the revolver found in his apartment with the specific intent to assist his gang. He relies on three decisions to support this contention: *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*); *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*); and *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved in part in *People v. Vang, supra,* at page 1047, footnote 3.

The defendant in *Ramon* was stopped driving a car that had been reported as stolen. A handgun was found under the driver's seat. The defendant and his companion were charged with receiving a stolen vehicle and unlawful possession of a firearm, along with allegations that their crimes were committed for the benefit of their street gang. Based on a hypothetical set of facts that tracked the prosecution's evidence, a gang expert testified that the crimes were committed for the benefit of a street gang because both defendants were gang members and they were stopped while in their gang's territory.

The *Ramon* court agreed with defendant's contention that those two facts were an insufficient basis for the expert's opinion because, without more, the conclusion was mere speculation. (*Ramon , supra,* 175 Cal.App.4th at p. 851.)

The *Frank S.* court reviewed a judgment that a minor was a ward of the juvenile court for having carried a concealed dagger, along with a finding that he did so to benefit his gang. The *Frank S.* court reversed the gang allegation finding, concluding that an expert's testimony on the subject did not constitute sufficient evidence as to the minor's intent. As the *Frank S.* court characterized it, the expert "simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved for the trier of fact. . . . The prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish [the minor's intent]. The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. In fact the only other evidence was the minor's

7

statement to the arresting officer that he had been jumped two days prior and needed the knife for protection." (*Frank S., supra,* 141 Cal.App.4th at p. 1199.)

In *Killebrew, supra,* 103 Cal.App.4th 644, the court reversed a judgment that the defendant took part in a conspiracy by active gang members to possess a handgun. The case arose when Bakersfield police went on alert after members of the East Side Crips shot and killed members of the Country Boy Crips. On the lookout for retaliation, officers pulled over three cars carrying East Side Crips members, and found handguns inside two of them. Killebrew was spotted standing on a nearby sidewalk watching the arrests and was arrested because he was an East Side Crips member and officers assumed he had been inside one of the cars.[2]

The prosecution's gang expert testified about gang culture, psychology, and habits. He also testified that each of the individuals in the three cars knew there were guns in two of the cars and jointly possessed the guns with every other person in all three cars for their mutual protection. The *Killebrew* court held that the trial court erred by allowing that testimony because, although an expert may testify about gang culture and habits, he may not testify that a specific individual had specific knowledge or possessed a specific intent. (*Killebrew, supra,* 103 Cal.App.4th at pp. 657-658.)

None of these decisions is applicable here. The court in *Ramon, supra,* 175 Cal.App.4th 843, reversed because the only evidence to support the gang expert's testimony that the crimes were gang-related was the fact that the defendants were gang members and were found in their gang's territory driving a stolen car with a handgun inside. As a result, there was no evidence from which the expert could discern whether the defendants had acted on their own or for the benefit of their gang, making his opinion speculative. (*Id.* at p. 851.)

Similarly, the court in *Frank S., supra,* 141 Cal.App.4th 1192, reversed because the expert relied on no more than general evidence of gang culture to opine that the

---

[2]    As it turned out, evidence that Killebrew had been in any of the three cars was virtually nonexistent and the Court of Appeal therefore also reversed due to insufficiency of the evidence on that basis as well. (*Killebrew, supra,* 103 Cal.App.4th at p. 660.)

defendant possessed a dagger for the benefit of his gang, with no case-specific evidence that supported her conclusion. (*Id.* at p. 1199.)

In *People v. Vang, supra,* 52 Cal.4th at pages 1048-1049, the Supreme Court disapproved *Killebrew* to the extent it purported to hold that gang experts could not respond to questions that track the evidence concerning whether hypothetical conduct was gang related. Instead, *Killebrew* remained good law to the extent it held that a gang expert cannot offer an opinion about the defendants themselves. Here, gang expert Rodriguez opined in response to a hypothetical that tracked the facts in this case that a gang member would have possessed a second gun found at his home in order to benefit his gang. That testimony was therefore proper under *Vang.*

Finally, unlike *Frank S.* and *Ramon,* Rodriguez's opinion was supported by the evidence. There is no dispute that Yepez's firearm possession during the brandishing incident was gang-related. According to Rodriquez, it is common practice for gang members to stash guns at their homes for use by other gang members. The fully-loaded gun found at Yepez's house was not the same gun used during the brandishing incident, and ammunition for two other types of firearms were also found, indicating that Yepez had, or provided access to, multiple firearms for use by himself or other gang members. Based on this evidence, the jury was justified in concluding that the Yepez possessed the revolver found at his home for the benefit of his gang.

## DISPOSITION

The judgment is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J .

GRIMES, J.

9